**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**


**TENNESSEE VALLEY TRADES AND**    )
**LABOR COUNCIL and INTERNATIONAL**  )
**ASSOCIATION OF MACHINISTS,**    )
                                    )    **Case No. 3:04cv0391**
       **Plaintiffs,**         )
                                      )    **JUDGE TRAUGER**
**v.**                                )
                                      )
**DAY & ZIMMERMANN NPS, INC.,**     )
                                      )
       **Defendant.**        )


## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by the defendant Day & Zimmermann NPS, Inc. (Docket No. 44), to which the plaintiffs, Tennessee Valley Trades and Labor Council and International Association of Machinists, have responded (Docket No. 55), and the defendant has replied (Docket No. 65)  The plaintiffs have also filed a Cross-motion for Summary Judgment (Docket No. 50), to which the defendant has responded (Docket No. 58), and the plaintiffs have replied (Docket No. 69).[1]  Additionally before the court is the plaintiffs' Motion to Amend the Complaint (Docket No. 47), to which the defendant has responded (Docket No. 56).

For the following reasons, the Motion to Amend and Motion for Summary Judgment filed by the plaintiffs will be granted and the Motion for Summary Judgment of the defendant will be denied.

---

[1]The plaintiffs' Motion to Treat Plaintiff's Motion for Summary Judgment as Timely and to File a Reply Brief was granted on November 2, 2005 (Docket No. 68)

# I.    FACTS and PROCEDURAL HISTORY[2]

Defendant Day & Zimmermann NPS, Inc. ("DZNPS") is a contractor that provides plant maintenance and modification services to certain Tennessee Valley Authority ("TVA") power plants.  As part of its contract with TVA, DZNPS agreed to be bound by the terms and conditions of a collective bargaining agreement entered into between TVA and the plaintiffs in this case, the Tennessee Valley Trades and Labor Council ("Council") and the International Association of Machinists ("IAM").  The stated purpose of the collective bargaining agreement, titled Project Maintenance and Modification Agreement ("PMMA"), is to "set forth the basic Agreement covering the rates of pay, hours of work, and conditions of employment to be observed by the parties hereto."[3]  (Docket No. 44–6, Exhibit 8, Article I)

On or about December 9, 2002, DZNPS hired Donnie Lomax to work at the TVA plant located in Cumberland City, Tennessee.[4]  Mr. Lomax was assigned to work under the direct supervision of a TVA foreman and was designated as the IAM job steward.  Prior to this hire, in May of 2002, Lomax was indicted under 42 felony counts in the Circuit Court for Houston County, Tennessee.  On January 30, 2003, Lomax pled guilty to five of the counts.  On March 10, 2003, the Circuit Court entered judgment against Lomax.  The judgment contained a provision that required Lomax to serve nine months in jail and provided his eligibility for work

---

[2]Unless otherwise noted, the facts have been drawn from the Response by Plaintiff to Defendant's Statement of Undisputed Material Facts (Docket No. 54), and the Defendant's Reply to Plaintiff's Separate Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment (Docket No. 59).

[3]It is undisputed that the PMMA is binding on all parties to this litigation.

[4]From 1976 until his retirement in 2000, Lomax worked directly for TVA as a machinist. In 2001 and 2002, Lomax periodically worked for DZNPS.

release.

On or about March 11, 2003, TVA revoked Mr. Lomax's security clearance.  It is undisputed that TVA has certain security or access clearance requirements that apply to TVA employees as well as those individuals employed by contractors of TVA, such as DZNPS, and that TVA has the sole responsibility with respect to determinations as to whether a particular employee of DZNPS meets its security clearance requirements.  A DZNPS employee that fails to meet TVA's security clearance requirements or has had his or her security clearance revoked by TVA cannot access TVA plants.

According to TVA, Lomax no longer met its security requirements because individuals with one felony conviction within the past five years are "unemployable."[5]  On March 11, 2003, DZNPS was notified that Lomax did "not meet the suitability requirements to work at TVA and should be removed from [the] site" and would be escorted off the property by TVA police. DZNPS terminated Mr. Lomax's employment that same day.  According to DZNPS, Lomax's termination was a direct result of TVA's revocation of his security clearance.  Without clearance, Lomax could not access any of TVA's plants and, as a result, could not perform the job that he was hired to perform.

On the same day that he was fired, Lomax directed a handwritten note to TVA plant manager Bud Hancock.  In the note, Lomax states that he is "writing this grievance to appeal your decision for terminating me from my job at Cumberland, for the reason of the felony charge that was handed down to me in court."  (Docket No. 44–4)  Lomax also alleges discriminatory

_____

[5]It is undisputed that, as of March 10, 2003, Mr. Lomax had a felony conviction that was less than five years old.

treatment based on the fact that other employees with recent felonies continued to work at the Cumberland City plant with TVA security clearances. He sought to be "treated like everyone else and be reinstated with [his] rights and [his] job at TVA." On or about April 11, 2003, Bill Parker, the new IAM job steward at the Cumberland plant, filed with DZNPS a grievance form with Lomax's handwritten note attached. This form was assigned the number MCH169-0001 (the "Lomax grievance") and echoes the content of Lomax's handwritten note. As the relief or remedy sought, the grievance form states "Lift restriction." (Docket No. 44–4, Exhibit 5–E)

The PMMA provides, among other things, that DZNPS can only discharge employees for "just cause." (Docket 44–6, Exhibit 8, Article II(J)) It also has a multi-step grievance procedure through which an employee may protest "a termination, suspension, or violation of a specific provision of this Agreement." (*Id.*, Article VII) The PMMA establishes, however, that "[d]eterminations as to whether a security or access clearance should be granted or revoked, or actions related thereto, are not subject to the grievance procedure." (*Id.*, Article III(L)) Thus, it is undisputed that the grievance procedure cannot be invoked for the purpose of determining whether a TVA security or access clearance should or should not be granted or revoked.

The grievance procedure set forth in Article VII of the PMMA contains four discrete steps, the last of which is a referral to arbitration. Article VII establishes that Step I of the grievance procedure is to be conducted between the employee and/or the Local Union Representation and the employee's supervisor and, if the grievance is not resolved at Step I, the Local Union Representative must initiate Step II within five working days after Step I. Step II of the procedure is between an International Union representative, the job site representative, and the Labor Relations Manager of the contractor. If a grievance is not resolved within five days of

the start of Step II, the grievance may be referred to a Joint Administrative Committee ("JAC"),[6] which, as set forth in Article II(P) of the PMMA, is comprised of both representatives of the contractor and the Council, for consideration of all relevant information. Thereafter, if the grievance is not satisfactorily resolved after consideration of all relevant information by the JAC, and within ten working days of receipt of the grievance by the JAC, the contractor or the Council may appeal the grievance to an arbitrator selected under Article II(P) within ten working days.

On or about April 11, 2003, an informal Step I meeting took place with respect to the Lomax grievance. At this time, DZNPS denied Lomax any relief for his grievance and made the following notation on the grievance form: "Refused Access to Property by TVA. Not Grievable." DZNPS and IAM did not engage in a Step II meeting and, instead, proceeded directly to a Step III meeting of the JAC.

The JAC met to consider the grievance on or about May 6, 2003, but decided upon a continuance to which the parties had previously agreed. The JAC met again on or about June 19, 2003, and, after discussions, held the grievance in abeyance pending obtaining additional information from TVA. At this same meeting, IAM representative Ed Pierce voiced a question to the JAC about the lack of notice to Mr. Lomax of the TVA security rules. It is undisputed that this was the first time that the issue of notice was raised.

The JAC reconvened on or about November 5, 2003. However, neither Mr. Lomax's grievance nor Mr. Pierce's questions were resolved at that time, and the entire matter was referred to arbitration. The referral was a decision of Carl Murphy, Administrator for the

---

[6]Article VII provides that the grievance must be referred to the JAC within five working days.

5

Council, who has discretion to cut off discussion of the JAC and refer the matter to arbitration.

In accordance with Article II(P), the Council requested the TVA to procure a panel of arbitrators on or about November 18, 2003. A panel was procured on or about January 27, 2004, and, on or about January 30, 2004, defendant DZNPS and plaintiff IAM scheduled a meeting to strike potential arbitrators. However, on or about February 2, 2004, DZNPS notified plaintiffs that it objected to arbitration and refused to participate.

On May 3, 2004, the plaintiffs filed a Complaint in this court, seeking "to compel arbitration of a grievance under a collective bargaining agreement." (Docket No. 1) According to the Complaint, the grievance filed by IAM on behalf of Donnie Lomax protests his discharge as violative of Article II(J) of the PMMA, which provides that DZNPS can only terminate employees "for proper cause." (*Id*. at ¶ 8) Plaintiffs further contend that the grievance presents a question as to "whether there was proper notification to Donnie Lomax or proper application to Donnie Lomax of a rule pertaining to security or access clearance as a result of which he was discharged in violation of II.J." (*Id*. at ¶ 12) According to the plaintiffs, the grievance does not question whether a security or access clearance should be granted or revoked for Donnie Lomax. Thus, plaintiffs assert that all questions concerning resolution of the grievance should be submitted to an arbitrator. (*Id*.)

II.     ANALYSIS

Defendant DZNPS has filed a Motion for Summary Judgment arguing primarily that the grievance at issue is not subject to arbitration under the grievance procedure set forth in Article VII of the PMMA, because the subject of the grievance is specifically excluded from the

6

grievance procedure by virtue of Article III(L), which states that "[d]eterminations as to whether a security or access clearance should be granted or revoked, or actions related thereto, are not subject to the grievance procedure." (Docket No. 45 p. 6) DZNPS further contends that plaintiff's argument that DZNPS breached the PMMA by failing to give proper notification to Lomax that the receipt of a felony might result in the revocation of his security clearance by TVA, which could ultimately result in the termination of his employment by DZNPS, is not subject to arbitration under the grievance procedure because neither Lomax nor IAM asserted this argument at Step III of the grievance procedure. Defendant further argues that this dispute is excluded from arbitration under Article III(L) as an action related to a determination concerning the revocation of a security clearance. Finally, DZNPS asserts that plaintiffs have no standing to recover breach of contract damages on behalf of either Mr. Lomax or themselves and, moreover, that it did not breach the PMMA with respect to Lomax's termination.

    In response, plaintiffs first argue that they are entitled to summary judgment on their request to arbitrate because the defendant has waived its objection to arbitration by participating in the grievance resolution process. Next, plaintiffs aver that the language of the PMMA requires DZNPS to submit both the Lomax grievance and the question raised by Ed Pierce as to proper notification to arbitration. According to the plaintiffs, the PMMA creates two separate tracks for dispute resolution, both of which lead to arbitration. Plaintiffs maintain that, in addition to the grievance procedure set forth in Article VII, Article II(P) of the PMMA permits IAM and other unions to raise issues directly to the JAC; therefore, the fact that the issue of proper notification was not raised until the Step III meeting before the JAC does not prevent the question from going to arbitration. Lastly, plaintiffs contend that, even if the court finds that

7

arbitration should not be ordered on either issue related to the treatment of Donnie Lomax, plaintiffs retain standing to assert their breach of contract claim.

**A.      Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the court must view the factual evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). If the nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537–38 (6th Cir. 1999).

To preclude summary judgment, the nonmoving party "is required to present some

8

significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon*, 107 F.3d 1171, 1174–75 (6th Cir. 1997). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor. Id. at 255.

The court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52). "There is no genuine issue for trial unless the nonmoving party has produced enough evidence for a jury to be able to return a verdict for that party." *Tinsley v. General Motors Corp.*, 227 F.3d 700, 703 (6th Cir. 2000). If the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249–52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citations omitted).

**B.     Arbitrability**

The primary issue before the court is whether DZNPS is required to submit to arbitration either of the disputes raised by plaintiffs regarding the treatment of Donnie Lomax.  While arbitration is a preferred method of settling labor disputes, it is well-established that arbitration is a matter of contract and, thus, a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit.  *AT & T Techs., Inc. v. Communications Workers*, 475 U.S. 643, 648–651 (1986) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).  It is also well-settled that, unless the parties clearly and unmistakably provide otherwise, whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance is an issue for judicial determination.  *United Steelworkers of America v. Mead Corp.*, 21 F.3d 128, 131 (6th Cir. 1994) (citing *AT & T Techs.*, 475 U.S. at 648–651).  In making this determination, a court is not to consider the merits of the underlying claim.  *Id.*

Pursuant to the Labor Management Relations Act, the interpretation of collective bargaining agreements is governed by traditional rules of contract interpretation, as long as their application does not conflict with federal labor policy.  *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991).  Where the agreement contains an arbitration clause, there is, however, a presumption in favor of arbitrability.  *Mead Corp.*, 21 F.3d at 131 (citing *AT & T Techs.*, 475 U.S. at 650).  Accordingly, courts should resolve any doubts in favor of arbitration and should not deny an order to arbitrate "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *AT & T Techs.*, 475 U.S. at 650 (quoting *Warrior & Gulf*, 363 U.S. at 582–83).  Furthermore, as the

10

Sixth Circuit has noted, in cases involving broad arbitration clauses, the Supreme Court has found the presumption of arbitrability "particularly applicable" and found that only an express provision excluding a particular grievance from arbitration or "the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Mead Corp*., 21 F.3d at 131 (citing *AT & T Techs*., 475 U.S. at 650).

Here, the PMMA provides that an employee may file a grievance "to protest a termination, suspension, or violation of a specific provision of this Agreement." All such grievances are subject to a four-step grievance procedure set forth in Article VII of the PMMA, of which the final step is arbitration. Because the collective bargaining agreement contains an arbitration clause, the presumption in favor of arbitrablity applies. Whether the arbitration clause is the type of broad clause to which the presumption is "particularly applicable" is a separate question.

In *Mead Corp.*, the Sixth Circuit described the circumstances in which the Court had previously deemed arbitration clauses to be the type of broad clauses to which the presumption in favor of arbitrability was considered "particularly applicable":

> In *Communications Workers v. Michigan Bell Tel. Co*., 820 F.2d 189, 193 (6th Cir. 1987), this Court deemed the presumption of arbitrability particularly applicable where an arbitration clause provides for "arbitration of any controversies regarding interpretation of the contract." *See also International Union* , 941 F.2d at 468, 472 (finding the presumption particularly applicable where the arbitration clause covered "matter[s] involving the interpretation or application of, or compliance with any of the terms of this Agreement"); *Local 670, United Rubber Workers v. International Union, United Rubber Workers*, 822 F.2d 613, 617 (6th Cir. 1987) (finding the same where the agreement at issue subjected any unresolved grievance to arbitration, and defined a grievance as a dispute involving an allegation that the company had not complied with the agreement and "a question concerning the meaning, interpretation, scope, or application" of the agreement), *cert*. *denied*, 484 U.S. 1019, 108 S.Ct. 731, 98 L.Ed.2d 679 (1988).

11

21 F.3d at 132. In *Mead Corp.*, because the arbitration clause at issue included within its scope "grievances charging that the Company has violated this Agreement and involving the interpretation of, or compliance with, this Agreement," the Court found the presumption of arbitrability particularly applicable. *Id*.

The agreement at hand likewise establishes within the scope of permissible grievances allegations that a specific provision of the agreement has been violated and subjects any unresolved grievances to arbitration. Furthermore, Article VII of the PMMA establishes the broad authority of the arbitrator "to determine the meaning, application of, or compliance with the provisions of this Agreement...." Accordingly, the presumption of arbitrability is particularly applicable to this case and, as a result, the grievances at issue will be excluded from the arbitration process only if the agreement contains express provisions so excluding them or if there is forceful evidence of a purpose to do so.

With these principles in mind, the court considers whether the parties are obligated to arbitrate the disputes at issue here under the terms of the PMMA.[7]

---

[7]As a threshold matter, plaintiffs argue that the defendant has waived its right to object to the arbitratability of the disputes because it participated, without objection, in the underlying grievance resolution process, which culminates in arbitration. As noted by the plaintiffs themselves, and explained in further detail herein, *infra* pp. 17–18, procedural issues such as waiver are presumptively matters for an arbitrator, not a judge. *See Howsam v. Dean Witter Reynolds, Inc*., 537 U.S. 79, 84 (2002) ("[T]he presumption is that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability.") (internal quotations omitted); *see also John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964) (holding that arbitrator, not court, should decide whether first two steps of grievance procedure were completed, where steps are prerequisites to arbitration). Because there is no evidence that the parties intended for the court, as opposed to an arbitrator, to decide such procedural issues, the court declines to consider them.

12

### 1. The Lomax Grievance[8]

DZNPS argues that the Lomax grievance is excluded from the arbitration process by virtue of Article III(L), which provides in pertinent part that "Determinations as to whether a security or access clearance should be granted or revoked, or actions related thereto, are not subject to the grievance procedure." According to the defendant, the plain meaning of this portion of Article III(L) "demonstrates that, if the subject matter of the grievance challenges the determination by TVA to grant or revoke a security clearance, the grievance procedure (which includes arbitration) cannot be invoked." (Docket No. 45 p. 8) The defendant maintains that the only reasonable reading of the grievance is as a direct challenge to TVA's determination to revoke Lomax's security clearance.

Plaintiffs admit that the grievance procedure cannot be invoked for the purpose of determining whether a TVA security or access clearance should or should not be granted or revoked but contends that the Lomax grievance does not challenge TVA's security determination. Rather, according to plaintiffs, the grievance challenges DZNPS's decision to fire Lomax. Plaintiffs assert that Lomax was requesting "DZNPS to lift its own restriction on his continued engagement as a DZNPS employee," and they claim that "DZNPS could have done this by assigning him to different work falling outside of TVA's security rules." (Docket No. 55 pp. 15–16)

Thus, the first matter at hand is to determine how the underlying grievance or dispute should be characterized– as a challenge to TVA's security clearance determination or as a

---

[8]For summary judgment purposes only, the parties refer to Lomax's hand-written note and formal grievance MCH 169-00001, collectively, as the "Lomax grievance." (Docket No. 45 p. 6 n. 4)

13

challenge to DZNPS' termination of Lomax.  To do so, we must look to the grievance itself.  On the grievance form, as the "Employee's Statement of Grievance," Bill Parker, the IAM job steward at the Cumberland plant, incorporated by reference the handwritten note composed by Lomax on the day that he was fired.  In the note, Lomax states that he is "writing this grievance to appeal your decision for terminating me from my job at Cumberland, for the reason of the felony charge that was handed down to me in court."  (Docket No. 44–4)  Lomax also alleges discriminatory treatment based on the fact that other employees with recent felonies continued to work at the Cumberland City plant with TVA security clearances.  He sought to be "treated like everyone else and be reinstated with [his] rights and [his] job at TVA."  *Id.*

Though the handwritten note was initially directed to the plant manager at TVA rather than directly to DZNPS, it is undisputed that DZNPS, not TVA, terminated Lomax's employment.[9]  In light of this fact, the grievance, which states that it is an appeal of "your decision for terminating me from my job," can fairly be read as a substantive challenge to DZNPS' decision to terminate Lomax from his job, rather than a direct challenge to TVA's determination to revoke Lomax's security or access clearance.

Article VII of the PMMA clearly states that "[a] grievance may be filed by an employee to protest a termination... or violation of a specific provision of this Agreement," and that such a grievance is subject to arbitration by virtue of the four-step grievance procedure.  While "[d]eterminations as to whether a security or access clearance should be granted or revoked, or actions related thereto," are not subject to this grievance procedure, it cannot be said with the

[9]It is understandable that Lomax directed the note to someone at his workplace and the location at which his termination took place.

14

requisite "positive assurance" that an otherwise permissible grievance protesting a termination should be excluded from the grievance process by virtue of the defendant's assertion that the basis of the protested termination is a revoked security license. The phrase "actions related thereto" is broad and ambiguous and cannot be considered an "express provision excluding a particular grievance from arbitration," which the "particularly applicable" presumption in favor of arbitration requires. *AT & T Techs.*, 475 U.S. at 650. Because the PMMA does not contain an express provision excluding from the grievance procedure any grievance protesting a termination that is purportedly predicated on a security determination, because there is no forceful evidence of a purpose to so exclude, and because all doubts must be resolved in favor of arbitration, the court finds that the grievance regarding Lomax's termination is subject to arbitration. The court simply cannot conclude, with the compulsory level of conviction, that the agreement is not susceptible to an interpretation that covers the asserted dispute.

### 2. Issue of Proper Notification

In a separate motion, plaintiffs seek to amend their Complaint to add an allegation that, at the Step III meeting in June of 2003, Ed Pierce independently raised the issue of whether Lomax had received fair, advance notice of the consequences of his plea bargain. Specifically, the plaintiffs request leave to amend in order to add the following language to the Complaint: "At a meeting on or about June 19, 2003, the Joint Administrative Committee agreed to hold grievance MCH169-00001 in abeyance. At this time, IAM representative Ed Pierce independently raised the question of whether Mr. Lomax had received fair, advance notice of the consequences of his plea bargain." (Docket No. 47 p. 1) Plaintiffs also wish to alter the prayer for relief to request "an equitable order directing and requiring DZNPS to cooperate in the submission to an

arbitrator" of not only grievance MCH169-0001, but also "IAM representative Ed Pierce's question of fair notice before the Joint Administrative Committee on or about June 19, 2003." (*Id.*)

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a pleading "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). In *Foman v. Davis*, 371 U.S. 178 (1962), the Supreme Court stated:

> Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of the amendment, etc. – the leave sought should, as the rules require, be 'freely given.' Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Id.* at 182 (internal citations omitted). Thus, leave should be given unless there is a showing of undue delay, bad faith or dilatory motive on the part of the moving party, undue prejudice to the non-moving party, or futility of the proposed amendment. *Id.*; *see also Hahn v. Star Bank*, 190 F.3d 708, 715 (6th Cir. 1999). The Sixth Circuit has found that "[t]he thrust of Rule 15 is... that cases should be tried on their merits rather than the technicalities of pleading." *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 425 (6th Cir. 1999) (quoting *Tefft v. Seward*, 689 F.2d 637, 639 (6th Cir. 1982)).

Defendant objects to the Amendment on the ground that it purportedly asserts an entirely new cause of action and legal theory for which additional discovery would be necessary.

16

DZNPS alleges that "neither the Complaint nor Mr. Pierce's deposition testimony put Defendant on notice that it would have to defend a claim arising under the 'alternative' method for dispute resolution." (Docket No. 57 p. 6)

Defendant's concerns, however, are misplaced. Even with the proposed Amendment, the cause of action here remains one to compel arbitration under a collective bargaining agreement, and the original Complaint sufficiently placed the defendant on notice that the plaintiffs believed that the arbitrable issues included Lomax's alleged lack of notification of TVA's security requirements. *See Complaint* ¶ 12 ("[t]he grievance presents a question about whether there was proper notification to Donnie Lomax... of a rule pertaining to security or access clearance.").[10] The separate issue of whether two separate *procedural* tracks to arbitration exist under the terms of the agreement has no bearing on the questions of *substantive* arbitrability that are appropriate for judicial resolution in an action to compel arbitration.

As previously stated, in an action to compel arbitration, the "question of whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.' " *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2001) (quoting *AT & T Techs.*, 475 U.S. at 649). While the Supreme Court, in *Howsam*, observed that almost any "potentially dispositive gateway question" might be termed a "question of arbitrability," it ruled that the "question of arbitrability" has "a far more limited scope." 537 U.S. at 85. The Court noted that, in the absence of an agreement to the contrary, "issues of substantive arbitrability... are for a

_____

[10]Even the defendant acknowledges that the issue of proper notification "was specifically referenced in Paragraph 12 of the Complaint." (Docket No. 57 p. 5)

court to decide and issues of procedural arbitrability, *i.e.*, whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide." *Id.*; *see also Smith v. Dean Witter Reynolds, Inc.*, No. 02-6158, 2004 WL 1859623, at *3 (6th Cir. Aug. 18, 2004).

Notably, plaintiffs' claim that Article II(P) of the PMMA provides for an "alternative route" to arbitration, distinct from the four-step grievance procedure set forth in Article VII, was asserted only in response to defendant's allegation that plaintiffs' failure to comply with Steps I and II of the Article VII grievance procedure rendered the dispute over proper notification inarbitrable.[11] The Supreme Court has previously declared such an objection to arbitration as raising a question of "procedural arbitrability" that is for the arbitrator and not the court.

In *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 555 (1964), the agreement at issue provided for arbitration as the third stage of the grievance procedure. Similar to DZNPNS, the party opposing arbitration in *Wiley* argued that, "since Steps 1 and 2 [of the grievance procedure] have not been followed, and since the duty to arbitrate arises only in Step 3, it has no duty to arbitrate this dispute." 376 U.S. at 556. The Court, however, rejected the opponent's assertion that "the question [of] whether 'procedural' conditions to arbitration have been met must be decided by the court and not the arbitrator," *id.*, and instead held that, "[o]nce it has determined, as we have, that the parties are obligated to submit the subject matter of a dispute to arbitration, "procedural" questions which grow out of the dispute and bear on its final disposition

---

[11]Plaintiffs countered that the fact that the issue of proper notification was not raised until Step III of the grievance procedure did not preclude arbitration because, pursuant to Article II(P), IAM could raise the issue directly to the JAC and, thereafter, appeal the issue to arbitration.

18

should be left to the arbitrator." *Id*. at 557.

Here, the subject matter of plaintiffs' dispute concerns whether DZNPS violated Article II(J) of the PMMA, which imposes a "proper cause" restriction on any firings by DZNPS, by failing to provide to Lomax proper notification of the security rules and the likely consequences for breaking them. According to plaintiffs, a fair notice requirement is generally read into clauses limiting discharges to "proper cause." Under the express terms of the PMMA, the arbitrator is given the authority "to determine the meaning, application of, or compliance with the provisions of this Agreement...." (Article VII) The question raised by Ed Pierce clearly involves a dispute as to the "meaning, application of, or compliance with" a provision of the PMMA– specifically, Article II(J)– and, as a result, is definitively subject to arbitration under the PMMA.[12] Because the parties are obligated to submit to arbitration the dispute over proper notification, and because the defense raised by the defendant, and the response thereto by the plaintiff, concern issues of procedural, rather than substantive, arbitrability, the validity of the defense shall be left for decision by the arbitrator.[13]

### C.     Breach of Contract Claim

While plaintiffs describe their action in this case as one to compel arbitration, they also claim that "IAM and Donnie Lomax have been damaged as a direct and proximate cause of the

---

[12]For the same reasons expressed, *supra* pp. 14–15, the defendant's alternative argument that the issue of notice is not arbitrable because it is excluded under Article III(L) as an action related to a determination concerning the revocation of security clearance also lacks merit.

[13]Because the issue of procedural compliance is for the arbitrator, not the court, defendant's concerns regarding the purported need for further discovery on the matter are unwarranted.

19

breach by D&Z/NPS of the collective bargaining agreement" and seek a "judgment for damages in favor of IAM and Donnie Lomax against D&Z/NPS." (Docket No. 1 ¶ 13) Defendants move for summary judgment on this claim, asserting that: (1) plaintiffs lack standing to recover breach of contract damages on behalf of either Mr. Lomax or themselves; and (2) even assuming the existence of standing, no reasonable fact finder could conclude that it breached the PMMA with respect to Lomax's termination.

Summary judgment is not warranted on either basis. Defendant's standing argument has no merit in light of Supreme Court precedent interpreting the scope of § 301 of the Labor Management Relations Act[14] as inclusive of "suits to vindicate individual employee rights arising from a collective bargaining contract." *Smith v. Evening News Ass'n*, 371 U.S. 195, 200 (1962) ("The rights of individual employees concerning rates of pay and conditions of employment are a major focus of the negotiation and administration of collective bargaining contracts.... To exclude these claims from the ambit of § 301 would stultify the congressional policy of having the administration of collective bargaining contracts accomplished under a uniform body of federal substantive law."); *see also Int'l Union v. Hoosier Cardinal Corp*., 383 U.S. 696, 699 (1966) ("There is no merit to the contention that a union may not sue to recover wages or vacation pay claimed by its members pursuant to the terms of the collective bargaining contract."). Though the plaintiffs do have standing to assert a breach of contract claim in this case, the court declines to grant either the plaintiffs' request to set the issue of breach for trial or

_____

[14]Section 301(a) of the Act provides that: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a).

the defendant's request to grant summary judgment on the merits of the breach of contract claim. The court has previously determined that the parties are bound, pursuant to the PMMA, to arbitrate the grievances at issue here. Thus, the dispute over whether the defendant's conduct constitutes a breach of the PMMA must be left for natural resolution through the required arbitration process. *See Drake Bakeries, Incorp. v. Local 50*, 370 U.S. 254, 266 (1962).

III.     **CONCLUSION**

For these reasons, the plaintiffs' Motion to Amend and the plaintiffs' Motion for Summary Judgment will be granted. The Motion for Summary Judgment of the defendant will be denied. The Lomax Grievance and the question of fair notice raised by Ed Pierce before the JAC on June 19, 2003 will be submitted to arbitration, and this action will be dismissed without prejudice.

An appropriate order will issue.

ALETA A. TRAUGER

United States District Judge